# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | * | CRIMINAL NO. 20-65 |
| v. | * | SECTION: "L" |
| ASHTON J. RYAN, JR. | * | |
| WILLIAM J. BURNELL | | |
| ROBERT B. CALLOWAY | * | |
| FRANK J. ADOLPH | | |
| FRED V. BEEBE | * | |

*     *     *

## <u>ORDER AND REASONS</u>

Before the Court are Defendant Fred Beebe's motions to dismiss the Second Superseding Indictment, R. Doc. 434, and to suppress statements, R. Doc. 433. The Court permitted Beebe to file a post-submission supplemental memorandum in support of his motion to dismiss. R. Doc. 719. The government filed a consolidated opposition to Beebe's motions, R. Doc. 488, and a response to Beebe's supplemental memorandum, R. Doc. 723. Considering the briefs, the oral argument of counsel, the record, and the applicable law, the Court now rules as follows.

## I.     BACKGROUND

This case arises from alleged fraudulent bank activity at First NBC Bank ("the Bank"), the failure of which cost the Federal Deposit Insurance Corporation's deposit insurance fund approximately $996.9 million. On August 5, 2021, a 49-count Second Superseding Indictment ("the Indictment") was entered charging Defendants with conspiracy to commit bank fraud, bank fraud, and false entries in bank records. R. Doc. 318. In relevant part, the Second Superseding Indictment alleges that Bank Officers and borrowers participated in a scheme to defraud the Bank and enrich themselves by lying on loan documents about borrowers' creditworthiness, the purposes of the loans, and the method of repayment. *Id.* at 7.

Defendant Ashton J. Ryan, Jr. was a founder of the Bank and acted as its President, Chief Executive Officer, and Chairman of the Board from approximately May 2006 to December 2016. *Id.* at 2. Defendant William J. Burnell was the Bank's Chief Credit Officer. *Id.* at 3. Defendant Robert B. Calloway was the Bank's Executive Vice President and served as a commercial relationship manager with a specialization in tax credit. *Id.* Defendant Fred V. Beebe was the Bank's Senior Vice President and a commercial relationship manager. *Id.* Defendant Frank Adolph was a borrower at the Bank individually and through related entities, and by the time the Bank closed, Adolph and his related entities owed the Bank approximately $6.1 million. *Id.* at 5.

## II.     PRESENT MOTIONS

### A.  Beebe's Motion to Dismiss, R. Doc. 434

Invoking both Fifth Amendment due process and this Court's supervisory powers, Beebe moves to dismiss the Indictment against him, arguing that the government is selectively prosecuting him and engaging in improper forum shopping. Regarding his first argument, Beebe argues that dismissal is warranted because the government chose to charge him but not other similarly situated Bank officers. R. Doc. 434 at 1; R. Doc. 719. As to the latter argument, Beebe

contends that the government indicted him for the improper purpose of recusing Judge Milazzo, to whom this matter was originally, randomly allotted. R. Doc. 434 at 1; R. Doc. 434-30 at 1. Beebe requests discovery in aid of his motion and an evidentiary hearing. R. Doc. 434 at 1; R. Doc. 719 at 1.

In opposition, the government disputes that Beebe was selectively prosecuted, contending that he is not comparably situated to other Bank officers who were not charged and that it did not engage in bad faith in indicting him. R. Doc. 488 at 1. The government also argues that no evidence plausibly supports the inference that it indicted Beebe as a means of forum shopping.

### B.  Beebe's Motion to Suppress Statements, R. Doc. 433

If the Court does not grant in full Beebe's motion to dismiss, Beebe requests an evidentiary hearing followed by the suppression of statements that he asserts were given "under the government's false representation that he was not a subject or a target of their investigation." R. Doc. 433 at 1.[1] In particular, Beebe seeks to suppress statements made during: (1) an interview he gave at the FBI's New Orleans field office on May 24, 2017 to investigators who are part of the prosecution team, R. Doc. 433-8;[2] (2) depositions taken by investigators with the FDIC in its corporate capacity ("FDIC-C")—an entity that is not part of the prosecution team— on February 21, 2018, and March 16, 2018, respectively, as part of a civil enforcement action

---

[1] The terms "subject" and "target" are terms of art that are defined by the Justice Manual published by the Department of Justice.

[2] This Court has previously defined the prosecution team to include only the following entities: the FBI New Orleans Field Office, the FDIC-OIG Criminal Investigative Field Office in Dallas, and the Federal Reserve Board of Governors OIG Criminal Investigative Field Office in Miami. R. Doc. 311 at 5-6.

At the May 24, 2017 meeting, Beebe asserts that agents questioned him about loans made to borrower Treme—loans that may be at issue in this case. He claims that this conversation topic is "conspicuously absent" on the Form 302 memorializing the meeting and thus requests production of the notes taken by each agent present at the meeting. R. Doc. 433-1 at 6.

undertaken by the agency, R. Doc. 433-9-10; and (3) a deposition he gave on April 19, 2019 in the civil matter *Douglas Mendoza, et al. v. Doyle International Louisiana, LLC, et al.*, No. 17-cv-437 (M.D. La.), a case concerning loans made by the Bank to a borrower. R. Doc. 433-5.

Beebe argues that the government's use of these statements—statements he claims were obtained by deceit—violates the Fourth Amendment and the Fifth Amendment's Due Process Clause. R. Doc. 433 at 1. He also contends that the government "manipulate[d]" a "simultaneous civil investigation for its own purposes," and therefore permitting the government to use statements made during the civil investigation in this criminal matter would "depart[] from the proper administration of justice." R. Doc. 433-1 at 7-8.

In opposition, the government asserts that, during the course of its contacts with Beebe and his counsel, no member of the prosecution ever made any promises or assurances to Beebe, either express or implied, that he would not in the future be a subject or target of an investigation. R. Doc. 488 at 4. Thus, the government argues that Beebe fails to uphold the heavy burden of showing by clear and convincing evidence that the government obtained the statements and testimony he seeks to suppress by dint of prosecutorial trickery or deception. R. Doc. 488 at 25-41.

## III.   DISCUSSION

The Court will first consider Beebe's motion to dismiss. Only if the Court denies that motion must it consider Beebe's alternative motion to suppress statements.

### A.  Beebe's Motion to Dismiss, R. Doc. 434

Beebe make two principal arguments in his motion to dismiss: the government (1) violated equal protection by selectively prosecuting him and not other similarly situated Bank officers because of his familial and business connections with Judge Milazzo, thereby infringing on his First Amendment associational rights, and (2) engaged in misconduct by indicting him to

force Judge Milazzo's recusal in order to secure a new forum. Beebe contends that he is entitled to discovery and an evidentiary hearing on his selective prosecution claim. R. Doc. 430-30 at 7-25.

Central to both of Beebe's arguments for dismissal is the timeline of the government's investigation and prosecution. He argues that the sequence of events evidences that the government indicted him for an improper purpose—namely, to secure Judge Milazzo's recusal. Accordingly, before addressing the merits of Beebe's arguments, the Court briefly recapitulates the history of the prosecution as pertinent to this motion.

First, on July 10, 2020, the government indicted Defendants Ashton Ryan, William Burnell, Robert Calloway, and Frank Adolph. The following month, on August 4, 2020, the government "had an *ex parte* discussion" with Judge Milazzo to disclose certain "information that will be part of its Rule 16 discovery production" that concerned the banking relationship Judge Milazzo's family had with the Bank. R. Doc. 439-9 at 1. The government informed the Court that it intended to provide this information promptly to the defense but requested guidance from the Court as to the most appropriate method of disclosure. Doc. 439-9 at 1-2. According to the government, Judge Milazzo advised the government to disclose the information in the manner it deemed most appropriate. R. Doc. 439-9 at 1-2.

Later in August 2020, the government sent a letter to counsel for the above-named Defendants, disclosing the *ex parte* discussion with Judge Milazzo. R. Doc. 439. The letter also stated that Judge Milazzo and her sons had banking relationships with the Bank, that "Fred Beebe has a personal relationship with Judge Milazzo" and her two sons, and that Beebe "also acted as their loan officer" and was the loan officer for Warren Treme, a bank borrower who had pleaded guilty to charges related to his banking relationship. R. Doc. 439-9 at 2.

In response to defense requests concerning Beebe's role, the government supplemented its original disclosure by producing additional documents in early September 2020. R. Doc. 434-1 at 5. Thereafter, on September 9, 2020, Judge Milazzo held a status conference, and the parties discussed the government's disclosures. They specifically addressed that Judge Milazzo had co-signed a loan for one of her sons at the Bank and that Judge Milazzo had known Mr. Beebe's wife, Peggy, since childhood. R. Doc. 434-1 at 5. Judge Milazzo stated that she "had no problem with Mr. Beebe appearing as a witness and him being aggressively cross-examined," but added that she would have to recuse herself if Beebe were indicted and ordered any requests for recusal to be made by September 16, 2020. Doc. 43. Neither the defendants nor the government moved to recuse Judge Milazzo.

On October 6, 2020, prosecutors contacted Mr. Beebe's counsel, requesting a meeting and suggesting—"for the first time," according to Beebe—that Beebe had criminal exposure. R. Doc. 434-1 at 6. Around this same time, prosecutors investigated Beebe's wife, Peggy, by subpoenaing her Louisiana Department of Labor Records. R. Doc. 434-13. Beebe notes that the government did not seek DOL records for any other charged individual's spouse. R. Doc. 434 at 6. Prosecutors also subpoenaed the records of a credit card account held by both Fred and Peggy Beebe. R. Doc. 434-14.

On January 29, 2021, the grand jury issued a Superseding Indictment, which added Beebe as a Defendant. R. Doc. 65. This charging document added Beebe as a defendant in counts relating to Warren Treme and added three new counts. According to Beebe, this timeline "proves that the USAO knew of all relevant facts" to indict him "at the time it filed the original indictment." R. Doc. 434-30 at 6-7.

On February 2, 2021, Judge Milazzo held a status conference wherein she reiterated that she would have to recuse herself if Beebe were indicted.[3] That same day, Judge Milazzo recused herself, and the matter was reallotted to this Section. R. Doc. 84.

### 1. Selective Prosecution Defense

First, the Court turns to Beebe's argument that the Indictment must be dismissed because the government selectively prosecuted him. The government generally enjoys broad discretion in determining whom it will prosecute. That discretion, however, is constrained by the equal-protection component of the Fifth Amendment's Due Process Clause. This provision prohibits the government from choosing whom to prosecute "based on 'an unjustifiable standard such as race, religion, or other arbitrary classification.'" *United States v. Armstrong*, 517 U.S. 456, 464 (1996) (quoting *Oyler v. Boles,* 368 U.S. 448, 456 (1962)).

To prevail on a selective-prosecution challenge, a defendant must satisfy a two-prong test. First, "a defendant must 'make a *prima facie* showing that he has been singled out for prosecution while others similarly situated and committing the same acts have not." *United States v. Hoover*, 727 F.2d 387, 389 (5th Cir. 1984). Merely because the government exercises

---

[3] In relevant part, Judge Milazzo stated:

I set this matter for an early status conference because at an earlier meeting, the defendants' counsel and the Government, I indicated, after there was a disclosure, that my family members had done business with the bank and had a relationship with Mr. Beebe.

I indicated to you all at that time -- I think there was a concern about cross-examination of Mr. Beebe because we thought that he -- there was an indication that he would be a witness in this matter. And what I told you all, I think, very frankly at that time, is I certainly had no problem with Mr. Beebe appearing as a witness and him being aggressively cross-examined, that was not a problem.

But I was very clear that I felt that if he was indicted that I would have to recuse myself. I have known his wife all of her life. I have gone to church with her in Napoleonville. And what I believe I said was I would not preside and potentially have to sentence that man with his wife sitting on the front row. I've known Mr. Beebe through Peggy, and I'm just, I think I would have concerns about my ability, my objectivity during the course of that and certainly the appearance of impropriety because I've known Peggy all of her life and I know Fred.

R. Doc. 434-4 at 5.

"some selectivity . . . in instituting prosecutions is not itself a constitutional violation." *United States v. Greene*, 697 F.2d 1229, 1234 (5th Cir. 1983).

"Second, a defendant must then demonstrate that the government's discriminatory selection of him for prosecution has been invidious or in bad faith in that it rests upon such impermissible considerations as race, religion, or the desire to prevent his exercise of constitutional rights.'" *Hoover*, 727 F.2d at 389 (quoting *Greene*, 697 F.2d at 1229). Satisfying the second prong requires that the defendant demonstrate "that the government selected its course of prosecution 'because of,' rather than 'in spite of,' its adverse effect upon an identifiable group." *United States v. Sparks*, 2 F.3d 574, 580 (5th Cir. 1993) (quoting *Wayte v. United States*, 470 U.S. 598, 610 (1985)). Given the wide latitude afforded prosecutors over their charging decisions and the presumption that criminal prosecutions are undertaken in good faith, "defendants bear a very heavy burden" to establish invidious purpose. *Greene*, 697 F.2d at 1235; *see also Armstrong*, 517 U.S. at 463 (explaining that standard for succeeding on a selective-prosecution "is a demanding one"). If a defendant fulfills both prongs, then the burden shifts to the government to demonstrate a legitimate basis for selecting the defendant for prosecution. *Hoover*, 727 F.2d at 389.

Significantly, the Supreme Court has admonished that courts must apply a "rigorous standard" before authorizing discovery in aid of a selective prosecution defense. *Armstrong*, 517 U.S. at 468. With that in mind, the Court has approved of requiring defendants to "produce some evidence to show the existence" of each element of a selective-prosecution defense before any discovery may be permitted. *See id.* at 469; *see also United States v. Jennings*, 724 F.2d 436, 445 (5th Cir. 1984) (stating that a defendant "must first present facts sufficient to create a reasonable

doubt about the constitutionality of a prosecution" in order to obtain an evidentiary hearing (quoting *United States v. Hayes,* 589 F.2d 811, 819 (5th Cir. 1979)).

Concerning the first prong of the selective-prosecution defense, Beebe argues that he was chosen for prosecution whereas seven similarly situated loan officers and Bank employees were not. R. Doc. 430-30 at 9-23; R. Doc. 719 at 1-11. He contends that these other bankers engaged in the same conduct that he is charged with committing in the Indictment and, indeed, "were in positions of great authority, earned a larger salary," and were involved in loans resulting in greater losses to the Bank; yet, they have not been charged. R. Doc. 430-30 at 9; R. Doc. 719 at 1-11.[4] Beebe, however, fails to establish that he is similarly situated to these other individuals.

Significantly, Beebe was the only loan officer at the Bank making loans to the Bank President Ashton Ryan's business partner, Warren Treme, allegedly to prevent him from defaulting on their joint project. R. Doc. 488 at 12. And of the borrowers charged for fraud arising from the Bank's collapse, only Warren Treme—who was Beebe's client—was a business partner with Ryan." R. Doc. 488 at 12. Thus, the allegedly fraudulent loans that Beebe is charged in connection with are uniquely problematic in that they were used to enrich the Bank's president.

Beebe's circumstances can be further differentiated from the individuals with whom he claims he is similarly positioned. For example, Beebe cites the Bank's Chief Lending Officer and Executive Vice President Louis Ballero as a comparator. R. Doc. 430-30 at 10. Ballero was responsible for the loan relationship with Defendant Frank Adolph, which is described in the

---

[4] Specifically, Beebe discusses the following Bank officers and employees (1) Chief Lending Officer Louis Ballero ; (2) Executive Vice President Diana LaBorde (3) Bank Senior Vice President Bill Bennett; (4) Senior Vice President Michael Lulich; (5) Executive Vice President Ralph Menetre, III; (6) Senior Vice President and Loan Closing Manager Barbara Gibbs; and (7) Collections Manager David Cook. R. Doc. 488 at 10-24; R. Doc. 719 at 1-11.

Indictment. Beebe contends that the allegations involving Adolph's loan relationship are akin to those allegations in counts that he is named in. R. Doc. 434-30 at 10. But, in 2013, Ballero hired an auditor who uncovered Adolph's fraud, and, as stated in the Indictment, Ballero "repeatedly alerted Ryan and Burnell" regarding Adolph's fraud. R. Doc. 488 at 15; R. Doc. 318 at 15-16. Beebe claims that this makes Ballero's continued extensions of credit and recommendations for further loan approvals in 2015 "all the more egregious." R. Doc. 497 at 3. Nevertheless, Beebe did not similarly uncover and report fraud on the Bank to his superiors years before the Bank's demise, and thus the two loan officers conduct at the Bank is distinguishable.

Further, contrary to Beebe's assertions, Bank Senior Vice President Michael Lulich is not similarly situated to him. Lulich became the loan officer for coconspirator Gregory St. Angelo for several months between the time Ryan was stripped of his loan portfolio but before the Bank closed. R. Doc. 488 at 15. Beebe cites an email from Lulich to Defendant Burnell reporting that Ryan was approving overdrafts for St. Angelo, even though Ryan was supposed to have been divested of such authority. Another email from Lulich to fellow Bank officers states that the Bank had approved a loan for St. Angelo "to cover existing overdraft and pay loan costs." R. Doc. 430-30 at 21-22. At most, the email shows that Lulich was aware of this practice; it does not evidence that Lulich personally signed off on the extension of loans to cover interest. By contrast, the Indictment expressly charges Beebe with fraudulently approving loans to Treme by making false statements and material omissions regarding the purpose of the loan. *E.g.*, R. Doc. 318 at 30-31. Thus, based on the allegations in the Indictment and Beebe's own assertions about his proposed comparator, Lulich, the two are not similarly positioned.

That Beebe's status is not sufficiently similar to that of other Bank officers can be illustrated in additional ways. For example, if the sample group is limited to loan officers who

had more than one client plead guilty to fraud, only Beebe and Ryan meet this definition. R. Doc. 488 at 16.[5] And of course, they were both indicted.

To summarize, Beebe cannot succeed on the first prong of his selective prosecution defense because he has not shown that he is similarly situated with Bank employees and officers who were not charged by the government. Nor has he met the "rigorous standard" to show entitlement to discovery on this defense. *See Armstrong*, 517 U.S. at 468.

Even assuming Beebe did succeed on the first element of the selective prosecution defense, he fails to make a *prima facie* showing on the defense's second element—that the government prosecuted him for an invidious purpose or in bad faith. *See Hoover*, 727 F.2d at 389. Beebe argues that the evidence shows that he was indicted "not from his conduct [at the Bank], but from his First Amendment association rights to Judge Milazzo." R. Doc. 434-40 at 24. In Beebe's view, the government's investigation into and indictment of him was motivated by its desire to avoid having Judge Milazzo preside over this case. Beebe notes that Judge Milazzo, to whom this matter was originally allotted, had a longstanding friendship with his wife. He also states that Judge Milazzo told the parties that she would have to recuse herself if Mr. Beebe were indicted. R. Doc. 430-30 at 5, 24-25. Then, after Beebe was indicted, Judge Milazzo did in fact recuse herself. Beebe claims that this timeline of events suggests that the government chose to prosecute him out of a desire to impinge on his constitutional right to associate with Judge Milazzo, thereby forcing Judge Milazzo to recuse herself in order to obtain a new forum.

---

[5] Beebe claims that he is the "only loan officer charged by the government." R. Doc. 497 at 5. However, the Indictment also identifies Ryan and Calloway as loan officers. R. Doc. 318 at 4, 7 ("Ryan was [Kenneth] Charity's loan officer."); R. Doc. 318 at 4, 7 ("Calloway was [Gary] Gibb's loan officer.").

Prosecuting individuals for engaging in protected First Amendment activity constitutes an invidious prosecutorial purpose. *See Hoover*, 727 F.2d at 391. But the record here does not credibly suggest any such purpose or bad faith on the part of the government. Rather, the circumstances surrounding Beebe's indictment indicate that the government chose to indict him following the initial indictment based on evidence gathered during its ongoing investigation.

Borrower Treme—whose borrowing relationship with the Bank was overseen by Beebe—only interviewed with the government at the tail end of June 2020, little more than a week before the government presented the first indictment. R. Doc. 488 at 18. The government explains that this did not leave enough time for it to corroborate Treme's statements regarding Beebe or to substantively update what was an already-finalized indictment. R. Doc. 488 at 18. After the first indictment, the government's investigation into Beebe continued, including interviews with three of his subordinates who worked for him in the Bank's Kenner branch. R. Doc. 488 at 9.

For example, the government interviewed Holly Tamburello on August 11, 2020. She told the government that Beebe submitted loans for borrowers that he did not think were creditworthy, including Treme, because Ryan told him to do so. R. Doc. 488 at 9. And Michelle Buisson and Jason Picone, who were both interviewed in January 2021, also discussed with agents Beebe's alleged financial misconduct. R. Doc. 488 at 9. Beebe was then added to the Superseding Indictment, which was entered in February 2021.

As this accounting makes clear, there is an obvious explanation behind why Beebe was not named in the original Indictment and instead was added to the Superseding Indictment: the government's investigation into alleged fraud at the Bank continued following entry of the original indictment; additional information gathered by the government implicated Beebe in the

allegedly fraudulent scheme; and based on this additional information, the government made a decision to seek charges against Beebe. This is far and away the most straightforward and plausible reason that Beebe was added to the Indictment.

Beebe's attempt to present a counternarrative of bad faith on the part of the government in indicting him is not persuasive. Beebe claims the government engaged in a "belated and improper investigation" into his wife in an effort to secure Judge Milazzo's recusal. R. Doc. 434-30 at 424. But the government also investigated records that were in the names of spouses of other targets in its investigation—a practice the government regularly employs in white-collar cases to determine whether individuals engaged in misconduct while using their spouse's names. R. Doc. 488 at 20-21.

All told, Beebe's speculation of nefarious prosecutorial plotting does not overcome the presumption of good faith and regularity that attaches to criminal prosecutions. *Greene*, 697 F.2d at 1235. He thus has not made a *prima facie* showing on either of the two prongs of his selective prosecution defense, nor has he demonstrated entitlement to a discovery or an evidentiary hearing on his selective-prosecution defense.

### 2.  Improper Forum-Shopping Defense

Second, Beebe argues that the Indictment should be dismissed because the government abused its prosecutorial authority by indicting him in order "to forum-shop a new jurist." R. Doc. 434-30 at 8. "The supervisory powers of a district judge . . . allow him to impose the extreme sanction of dismissal of an indictment with prejudice only in extraordinary situations." *United States v. Campagnuolo*, 592 F.2d 852, 865 (5th Cir. 1979). A violation of the Due Process Clause also may merit dismissal of an indictment but only in the "rarest circumstances" where government misconduct is "'so outrageous' that it violates the principle of 'fundamental

fairness.'" *United States v. Johnson*, 68 F.3d 899, 902 (5th Cir. 1995) (quoting *United States v. Russell,* 411 U.S. 423, 431–32 (1973)). "Because meeting the standard 'is extremely demanding,' 'courts have rejected its application with almost monotonous regularity.'" *United States v. Alexander*, No. CR 15-295, 2016 WL 6518404, at *2 (E.D. La. Nov. 2, 2016) (first quoting *United States v. Sandlin*, 589 F.3d 749, 758 (5th Cir. 2009); then quoting *United States v. Nolan-Cooper*, 155 F.3d 221, 230 (3d Cir. 1998)).

Beebe's argument fails to meet the exceedingly high bar required for the Court to dismiss the Indictment against him based on the government's alleged forum shopping. Initially, the Court notes that Beebe's claim leaves wholly unaddressed why the government would want to have Judge Milazzo recused from the matter in favor of a different, randomly-allotted judge in this District. In other words, Beebe does not provide any motive for the government's alleged forum shopping. Beebe also fails to cite a single case granting dismissal on the basis of supposed forum shopping.

Moreover, "there is a plausible," lawful "explanation for the government's actions"—the government corroborated certain evidence after the first indictment was entered, prompting it to obtain a new indictment that added Beebe as a defendant, which had the incidental effect of causing Judge Milazzo to recuse herself. *Alexander*, No. CR 15-295, 2016 WL 6518404, at *2. Last, Beebe does not attempt to show any prejudice from the alleged forum shopping. *See Sinito v. U.S.*, 750 F.2d 512, 515 (6th Cir. 1984) ("Even when there is an error in the process by which the trial judge is selected, or when the selection process is not operated in compliance with local rules, the defendant is not denied due process as a result of the error unless he can point to some resulting prejudice."); *cf. Alexander*, No. CR 15-295, 2016 WL 6518404, at *2 (explaining that there was "need to transfer the case," considering, among other things, the defendant's admission

"that he has not been prejudiced by the prosecutors' alleged misconduct"). In short, Beebe's forum-shopping claim is unavailing. And Beebe has not shown how any additional discovery or an evidentiary hearing could alter this determination.

Accordingly, Beebe's motion to dismiss and his related requests for discovery and an evidentiary hearing are denied.

### B.  Beebe's Motion to Suppress, R. Doc. 433

Because the Court will not dismiss the Indictment against Beebe, it must address his alternative motion to suppress. Beebe requests that the Court hold an evidentiary hearing and thereafter suppress statements that he gave based on the government's purportedly false representation that he was neither a subject nor target of its investigation. R. Doc. 433 at 1. Because the chronology of Beebe's cooperation with government is key to his motion, the Court will briefly summarize this history.

First, on May 24, 2017, Beebe "debriefed" with case agents Krista Bradford of the FBI and Laurie Younger and Joe Melle of the FDIC-Office of Inspector General ("FDIC-OIG") given their alleged representation to Beebe that he was not the subject of a target or investigation R. Doc. 433-1 at 1. On May 31, 2017, Beebe, through counsel, e-mailed these agents, repeating his understanding that the agents had "indicated that Mr. Beebe is neither a subject nor a target of your investigation." 433-2 at 1. "Accordingly," Beebe's counsel provided certain documents to the case agents and stated a willingness to "continue to meet with you to answer any questions that you have." R. Doc. 433-2 at 1. Agent Bradford thanked Beebe's counsel in a reply email. R. Doc. 433-2 at 1. Then, in September 2017, Beebe's counsel provided Agent Bradford with Beebe's deposition in a civil case. R. Doc. 433-3.

Further, Beebe claims he fully cooperated with the FDIC-C's investigation into the Bank's failure. Beebe sat for two days of depositions before the agency—on February 21, 2018 and March 16, 2018—and never asserted his Fifth Amendment privilege against self-incrimination. R. Doc. 433-1 at 2. "Had he known that he was under criminal investigation," Beebe asserts that "he never would have given a statement." R. Doc. 433-1 at 2.

Next, in the spring of 2019, Beebe was subpoenaed by the plaintiff in the *Mendoza* civil lawsuit[6] for a deposition related to the plaintiff's claim of fraud as a basis to annul his loans from the Bank. R. Doc. 433-1 at 2. Operating under the alleged "promise" that he was not a subject or a target of the criminal investigation, Beebe, through counsel, advised the AUSA overseeing the criminal investigation into the Bank of his upcoming testimony. *Id.* On August 12, 2019, Beebe sat for his deposition in the *Mendoza* matter.

Beebe asserts that the government now seeks to use against him the testimony he gave during these interviews and depositions.[7] *Id.* at 5. And he claims that he only gave testimony and made statements based on the government's promise—which turned out to be false—that he was not being investigated. The government's trickery in obtaining his testimony, Beebe argues, vitiated his consent to give these statements. *Id.* at 3-4. Thus, Beebe contends that the testimony and statements were obtained in violation of the Fourth Amendment's bar on unreasonable searches and must be suppressed. Likewise, Beebe argues that the government deception violates due process and therefore requires suppression. *Id.*

---

[6] No. 17-cv-437 (M.D. La.).

[7] Specifically, Beebe claims that the allegations against him in the Indictment were discussed at length during his FDIC deposition. and that the government intends to introduce evidence under Rule 404(b) concerning the loans at issue in the *Mendoza* matter.

As additional, seemingly independent grounds for suppression, Beebe asserts that permitting the government to use his statements to agents that were procured through deception would "depart from the proper administration of justice" and "effectively negat[e] his Fifth Amendment right to silen[ce]." R. Doc. 433-1 at 8. Accordingly, Beebe request an evidentiary hearing on his motion to suppress, followed by the suppression of certain statements.

"It is a well established rule that a consent search is unreasonable under the Fourth Amendment if the consent was induced by the deceit, trickery or misrepresentation of [a government] agent." *United States v. Tweel*, 550 F.2d 297, 299 (5th Cir. 1977). Evidence obtained by trickery or material misrepresentations on the part of the government must be suppressed. *Id.* at 300.

But the "'mere failure' of a government official to warn that an investigation may result in criminal charges does not constitute fraud, deceit, or trickery"—and thus does not warrant suppression. *United States v. Posada Carriles*, 541 F.3d 344, 356 (5th Cir. 2008) (quoting *Tweel*, 550 F. 2d at 299); *see also United States v. Gillespie*, 974 F.2d 796, 800 (7th Cir. 1992) ("Gillespie concedes—as he must—that target warnings are not constitutionally mandated."). And a government agent's "'[s]ilence can only be equated with fraud where there is a legal or moral duty to speak or where an inquiry left unanswered would be intentionally misleading.'" *Tweel*, 550 F. 2d at 299 (quoting *United States v. Prudden*, 424 F. 2d 1021, 1032 (5th Cir. 1970)). Defendants bear the burden of proving by clear and convincing evidence that a misrepresentation or omission by the government was material. *Tweel*, 550 F.2d at 297; *accord United States v. Caldwell*, 820 F.2d 1395, 1399 (5th Cir. 1987) (requiring defendant to "show by *clear and convincing* evidence that the IRS agents made *material* misrepresentations about the nature of the inquiry").

Additionally, under Fifth Amendment's Due Process Clause and courts' inherent supervisory power to ensure the proper administration of justice, evidence may be suppressed "where the Government has brought a civil action solely to obtain evidence for its criminal prosecution or has failed to advise the defendant in its civil proceeding that it contemplates his criminal prosecution; []or with a case where the defendant is without counsel or reasonably fears prejudice from adverse pretrial publicity or other unfair injury;  []or with any other special circumstances that might suggest the unconstitutionality or even the impropriety of [a] criminal prosecution." *United States v. Kordel*, 397 U.S. 1, 11 (1970); *see also United States v. Setser*, 568 F. 3d 482, 493 (5th Cir. 2009) ("Deception as to the purposes of the investigation, or using otherwise meaningless civil proceedings as a pretext for acquiring evidence for a criminal prosecution, taking advantage of a person who does not have counsel, or other special circumstances may invalidate the prosecution.").[8] Absent such deceptive or unfair *Kordel* factors, "the government may conduct simultaneous civil and criminal proceedings without violating the due process clause or otherwise departing from proper standards in administering justice." *Setser*, 568 F.3d 482, 492–93 (5th Cir. 2009) (quoting *United States v. Posada Carriles,* 541 F.3d 344, 356 (5th Cir. 2008)).

In *United States v. Tweel*, a leading Fifth Circuit case on government trickery as grounds for suppressing a defendant's statements, an IRS revenue agent informed a taxpayer that his income tax returns were being audited. 550 F.2d at 298. To determine whether his client was involved in a criminal investigation, the taxpayer's accountant asked the IRS revenue agent whether a "special agent" was involved in the inquiry. *Id.* The revenue agent replied, accurately,

---

[8] Although the factors listed in *United States v. Kordel* deal specifically with the propriety of dismissing an indictment, courts have applied its considerations as part of suppression analyses. *See, e.g.*, *United States v. Teyibo*, 877 F. Supp. 846, 855-56 (S.D.N.Y. 1995).

that no special agent was involved, leading the accountant to believe that the IRS was merely conducting a civil audit. *Id.* However, the agent failed to disclose that the agency was not pursuing the type of routine audit that any taxpayer may be subject to from time to time. Instead, the agency was conducting the audit at the behest of a unit within the Department of Justice charged with investigating crimes. *Id.* Based on the revenue agent's misleading representation, the accountant voluntarily produced tax records to the revenue agent—records that were later used at trial to convict the taxpayer.

The Fifth Circuit found that the government had "grossly deceived" the taxpayer, calling the agency's action "shocking." *Id.* at 300. Not only was the IRS revenue agent aware that the agency was conducting an audit at the request of a criminal arm of the DOJ, he also "obviously knew the accountant inquired whether a special agent was involved to determine whether he was conducting a criminal audit." *Id.* at 299. In this context, even though the agent's response was, "on the face of it true," it "misled [the taxpayer] to such a degree that his consent to the 'search' must be vitiated by the agent's silence concerning the origin of this investigation." *Id.* at 299. In other words, the government conducted an unreasonable search in violation of the Fourth Amendment by failing "to apprise the [defendant] of the obvious criminal nature of [its] investigation." *Id.* The revenue agent's "silent misrepresentation was both intentionally misleading and material," and therefore any evidence obtained due to the agent's "sneaky deliberate deception" "should have been suppressed." *Id.* at 299; *id.* at 300.[9]

Similarly instructive is the Fifth Circuit's decision in *United States v. Setser*, 568 F.3d 482, 492 (5th Cir. 2009). There, the SEC and FBI engaged in parallel civil and criminal

---

[9] The Court ultimately remanded for a hearing to determine whether any evidence was untainted. *Tweel*, 550 F.2d at 300. Any tainted evidence, the Fifth Circuit directed, "must be suppressed and [the taxpayer] afforded a new trial."

investigations into two siblings' who ran a Ponzi scheme that had collapsed. Eventually, the SEC initiated a civil action against the siblings for violations of securities laws. The court overseeing the civil case appointed a receiver to preserve the siblings' assets. Thereafter, the siblings were indicted for wire and securities fraud. The receiver then provided FBI agents with records seized from the siblings' business that had served as a front for their fraudulent scheme. *Id.* at 486. In the criminal case, one of the sibling's moved to suppress these records, arguing that the government had violated the Fourth Amendment and Fifth Amendment due process by impermissibly mixing the receiver's civil investigation with the criminal case against him. *Id.* at 491.

The Fifth Circuit rejected the defendant's contention. In so doing, the Fifth Circuit distinguished the case from those relied upon by the defendant, particularly in *United States v. Scrushy*. In *Scrushy* "the trial court found that the government coordinated two investigations in a manner intended to mislead the defendants into believing there was no criminal investigation against them, including obtaining the defendants' depositions in the civil investigation with the intent to create evidence against them in the criminal case." *Id.* at 492 (citing 366 F. Supp. 2d 1134, 1138–39 (N.D. Ala. 2005)). In the view of the trial court in *Scrushy*, "the government's overall coordination of the investigations, and especially its apparent arrangement of a deposition in the civil case to create a 'perjury trap' for criminal prosecution purposes, while not informing the defendant that any criminal investigation was under way, was . . . an impermissible departure" from the proper administration of justice. *Id.* (quoting *Scrushy*, 366 F. Supp. 2d at 1139-40). "Although the government did not 'outright lie to' the defendant, it 'manipulated' the 'inescapably intertwined' investigations to an extent the district court found improper." *Id.* (quoting *Scrushy*, 366 F. Supp. 2d at 1139-40).

Contrasting the facts of *Setser* with *Scrushy*, the Fifth Circuit observed that Setser did not present "evidence of strategic, intentional cooperation of the sort the district court[] in . . . *Scrushy* found damning." Nor was Setser "lured into any cooperation by the false promise that the investigation was purely civil." *Id.* Further, no concern of self-incrimination was present. In short, even though the FBI's receipt of documents from the receiver ultimately proved helpful to the prosecution, Setser could "point to no 'trickery' or cloaking of the criminal investigation as civil." *Id.*

With this legal backdrop in mind, the Court will analyze whether the government violated the Fourth Amendment, due process, or departed from the proper standards in the administration of justice in procuring the following interviews and depositions of Beebe that he now argues should be suppressed: (1) an interview on May 24, 2017 before government agents conducting a criminal investigation, R. Doc. 433-8; (2) two depositions taken in February and March 2018 as part of a civil enforcement action brought by FDIC-C, R. Doc. 433-9; R. Doc. 433-10; and (3) an August 2019 deposition in the civil case *Mendoza*, no. 17-cv-437 (M.D. La.).

The key Fourth Amendment and due process questions raised by Beebe's motion are whether the government engaged in deception to obtain his cooperation and statements. *See Tweel*, 550 F. 2d at 299. The Court first turns to depositions, starting with his 2018 depositions before the FDIC-C.  Unlike in *Scrushy*, where the trial court found that the government closely coordinated civil and criminal investigations with the intent to mislead the defendant into believing there was no criminal investigation, there is no evidence here that the FDIC-C's civil inquiry was orchestrated or manipulated by the government in an effort to assist with its prosecution. *See Scrushy*, 366 F. Supp. 2d. at 1140. Indeed, the FDIC-C is not part of the prosecution team, and it did not willingly share documents obtained during its investigation with

the prosecutors; instead, the government only secured materials from the FDIC-C—including the transcript of Beebe's 2018 FDIC-C deposition—by resorting to grand jury subpoena. Thus, the facts concerning Beebe's FDIC-C's deposition align more closely with those in *Setser* where, even though the civil enforcement action ultimately yielded documents beneficial to the prosecution, there was no "cloaking of the criminal investigation as civil." 568 F.3d 482, 492. Beebe's sheer speculation to the contrary does not change this result or warrant an evidentiary hearing. *See United States v. Harrelson*, 705 F.2d 733, 737 (5th Cir. 1983) (explaining that "[f]actual allegations set forth in the defendant's motion [to suppress] must be 'sufficiently definite, specific, detailed, and nonconjectural, to enable the court to conclude that a substantial claim is presented'" in order to merit an evidentiary hearing (quoting *United States v. Poe*, 462 F.2d 195, 197 (5th Cir. 1972)).

And it is an even greater stretch for Beebe to argue that the government exerted any influence in the *Mendoza* civil case in which he gave a deposition in 2019. That dispute involved solely private parties. In other words, neither the government nor Beebe were parties to the suit in any capacity whatsoever. Beebe was deposed merely as a witness. And his deposition testimony was not given under any promise of immunity by the government—which, again, was a non-party to that civil case. The Court thus finds that the government did not mislead or trick Beebe in any way into giving deposition testimony in the *Mendoza* case. *Cf. United States v. Handley*, 763 F.2d 1401, 1405 (11th Cir. 1985) (individual defendants gave depositions during the course of a civil action brought by individual plaintiffs; deposition testimony was later used against the individual defendants during a criminal prosecution in which they were also defendants; court observed that any "[i]mpropriety in the taking of these [civil] depositions will authorize their suppression under the fifth amendment if and only if such conduct may be

imputed to the government"); *United States v. Fattah*, No. CRIM. 14-409, 2015 WL 289983, at *8 (E.D. Pa. Jan. 22, 2015) (where a city agency allegedly initiated a civil investigation while a parallel federal criminal investigation was ongoing, concluding that "the Government cannot be said to have manipulated simultaneous criminal and civil proceedings when it had control over only one" (internal quotation marks omitted)).

The Court next considers whether the government employed deception to procure Beebe's statements to criminal investigators in 2017. Beebe states that the government made a false "promise" to him that he was not the subject or target of the criminal investigation when he debriefed with case agents in May 2017. R. Doc. 433-1 at 2, 3; R. Doc. 434-2 at 1-3. But Beebe fails to allege that these "promises" were untruthful at the time they were made. Put differently, Beebe does not allege that the government affirmatively misrepresented his status as the subject or target of criminal investigation. Nor does Beebe allege that the government promised him that he had immunity or would never become a subject or target of an investigation.

Nevertheless, Beebe insists that the government's decision to continue to seek his cooperation without informing him of its "secret decision" to change his status from witness to subject and target was "fraudulent." R. Doc. 498 at 7. Although Beebe does not expressly state that the government changed his status from witness to subject and/or target during the period of his cooperation, this is implicit in—and necessary to—his argument. Even assuming that this occurred, the government does not commit fraud or deceit merely because it does not warn a cooperator of the nature of its investigation or his status in that investigation. *Posada Carriles*, 541 F.3d at 356 (5th Cir. 2008); *see also Gillespie*, 974 F.2d at 800.

But Beebe argues that the government's alleged silence as to his *change in status—i.e.*, from witness to subject or target of an investigation—imposed upon the government "a legal or

moral duty to speak.'" *Tweel*, 550 F. 2d at 299. In effect, Beebe seeks a rule creating an affirmative legal (or moral) duty upon government agents to proactively inform cooperating individuals of any change to their status over the course of an investigation, regardless of whether the cooperator has made any present inquiry. At the least, he believes such a rule should exist where the government advised a cooperating individual of his status at one time, but the cooperator's status has since changed. Beebe cites no caselaw that has ever imposed such a rule.

Admittedly, the Court is somewhat troubled by the allegation that the government withheld from Beebe the information that his status had changed, especially in light of Beebe's claims that he made statements and gave testimony to the government in reliance on earlier representations by the government that he was merely a witness.[10] The Court thus assesses where this case falls in the spectrum of less-than-fully-candid government communications to individuals ensnared in investigations.

Simply put, the allegations here do not rise to the type of "gross" deception in *Tweel*, 550 F.2d 299. Unlike in that case, there is no allegation that Beebe or his counsel were actively misled by the government. Rather, here the allegation is that Beebe was duped into continuing to cooperate because the government failed to inform that it no longer viewed him as a mere witness but instead regarded him, eventually, as a subject or target. Certainly, knowledge of this change in status would be relevant to Beebe's decision whether or not to further cooperate. But Beebe, a sophisticated businessman, was represented by counsel from the time he was a witness until, at some time, his status changed. And critically, Beebe does not allege that, at any point during this time, he or his counsel requested that the government inform him whether he was the

---

[10] The government argues that it did, in fact, intend to advise Beebe that his status had changed in February 2020 when it requested to meet with Beebe's counsel—even though the meeting ultimately never took place. According to the government, the import of its request for a meeting was clear—Beebe's was no longer a mere witness but instead had become a subject or target of its investigation. R. Doc. 488 at 19-20.

subject or target of a criminal investigation and that the government responded with an evasive or misleading answer as to his status. *See id.*

The Court also finds it unremarkable that Beebe's status evolved over the long course of the government's investigation into the massive Bank collapse—an investigation that started almost immediately after the Bank's closure in April 2017 and has continued since then, resulting in serial indictments. After all, this type of change in a cooperator's status may often be the natural outgrowth of a criminal investigation: as government agents' knowledge of criminal schemes and their players grows, someone whom the government once believed to be only a witness may morph into a subject or a target. In other words, that a cooperator's status may change is foreseeable to both the government and defendants alike—at least where, as here, the defendant is represented by counsel. And no barrier prevented Beebe or his counsel from making such an inquiry during the span of the years-long investigation; all that Beebe, an educated professional, or his attorney had to do was ask the government what his present status was before continuing to assist the government. If he or his counsel had done so and the government failed to answer honestly, then that would rise to a Fourth Amendment or due process violation. But that is not the situation here. The Court declines Beebe's invitation to fashion a blanket rule requiring the government to inform cooperating individuals that their status has changed, even absent a specific request put to the government.

But Beebe argues that he did make such a request. In early 2020, in the face of growing evidence that Beebe may have played a role in the bank fraud concerning Defendant Ashton Ryan's projects with borrower Warren Treme, the government contacted Beebe's counsel and scheduled a meeting for February 20, 2020 to discuss Beebe's potential criminal exposure. R. Doc. 488 at 6. The week before the planned February meeting, Beebe's counsel requested a letter

from the prosecution team confirming whether Beebe was the subject or target of an investigation.[11]

On February 24, 2020, the government postponed the planned meeting due to a conflict, writing to Beebe's counsel that "we can get back to you at the end of the week with some dates." R. Doc. 488 at 7. Shortly thereafter, the COVID-19 pandemic erupted. Amid the ensuing disruptions, the government apparently did not reschedule the meeting with Beebe's counsel.

Beebe points to this sole instance of neglect on the part of the government in apprising him of his status vis-à-vis the ongoing criminal investigation as constituting deception. Although the meeting regarding Beebe's criminal exposure was never held, this does advance Beebe's trickery-by-omission argument: the statements and testimony that Beebe seek to suppress all predate the February 2020 emails, with the latest such statements made in August 2019. Thus, the government's non-response to Beebe's February 2020 inquiry is irrelevant for purposes of his present motion.

In sum, in this case, the government deployed no trickery such as would overcome Beebe's volition in giving the statements and testimony he seeks to suppress.

Last, and as Beebe concedes, R. Doc. 498 at 7, none of the situations that the Court raised in *Kordel* as potentially amounting to a due process violation or a departure from the proper standards in the administration of justice are present here. *See* 397 U.S. at 11-2. Beebe does not allege that the FDIC-C—which, again, is not part of the prosecution team—commenced its civil enforcement action solely to obtain evidence for the government's criminal prosecution; Beebe had the assistance of counsel throughout the course of the government's investigation into him; and no other special circumstances suggest impropriety on the part of the government. 397 U.S.

---

[11] Counsel stated in her email that the letter was needed for insurance coverage purposes.

at 11-12. Beebe has not established—and certainly not by clear and convincing evidence, *Caldwell*, 820 F.2d at 1399—any basis for suppressing the statements and testimony he has given.

Finally, the Court considers Beebe's request for an evidentiary hearing. Evidentiary hearings on a motion to suppress "are not granted as a matter of course, but are held only when the defendant alleges sufficient facts which, if proven, would justify relief." *Harrelson*, 705 F.2d at 737. As noted, "[f]actual allegations set forth in the defendant's motion . . . must be sufficiently definite, specific, detailed, and nonconjectural, to enable the court to conclude that a substantial claim is presented." *Id.* (quoting *Poe*, 462 F.2d at 197). Here, Beebe's non-conclusory allegations, even if true, would not warrant suppression. An evidentiary hearing is thus unnecessary, and Beebe's request for such is denied.

## IV.     CONCLUSION

For these reasons,

**IT IS ORDERED** that Beebe's motion to dismiss and for discovery and an evidentiary hearing, R. Doc. 434, is **DENIED**.

**IT IS FURTHER ORDERED** that Beebe's motion to suppress and for an evidentiary hearing, R. Doc. 433, is **DENIED**.

New Orleans, Louisiana, this 5th day of August, 2022.

United States District Judge