UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

UNITED STATES                                DOCKET NO.:  20-CR-65

v.                                               SECTION:  L

FRED V. BEEBE

**MEMORANDUM IN SUPPORT OF MOTION TO COMPEL DISCOVERY**

Fred V. Beebe brings this motion to compel after making multiple entreaties to the government to produce the requested materials.  None of these requests are controversial.  Indeed, for most, the government agrees that Mr. Beebe is entitled to these materials. It nonetheless has remained steadfast in its rejection of each of Mr. Beebe's requests, requiring this motion.

1. **The Government should provide the 1A section of each file with respect to the witness interviews it produced.**

The government has provided hundreds of interviews memorialized in written reports by the investigating agents.  For many (if not most) of these reports, the prosecution team showed documents to the witnesses and obtained answers from the witnesses about the meaning and import of those documents.  The reporting agent then attested in the memorandum of interview (MOI) that he/she collected those documents and placed them in the 1A section of the file for that MOI.  Many of these MOIs, if not most, were prepared by FBI S/A Krista Bradford, whom the government has noticed as a trial witness, and for whom the government inaccurately claims it has produced all *Jencks* statements and all *Giglio* materials.  Likewise, the government has claimed inaccurately that it has produced all *Jencks* statements for all witnesses and all *Brady/Giglio* materials regarding this prosecution.[1]

---

[1] The government's failure to meet its *Brady/Giglio* obligations is easy to establish, and Mr. Beebe will present the latest example.  Although the Court ordered the government to produce all *Jencks* statements and all *Brady/Giglio* evidence no later than November 3, the government declined to

1

But the government often did *not* produce the 1A materials in discovery. While Mr. Beebe expected the 1A materials to follow (or perhaps precede) the MOI to which they relate, that also proved not to be the case. Making matters even more difficult, many of the 1A materials identified in the MOIs are *not* identified by any bates-range at all, and are simply described or mentioned. In addition, on other occasions, *e.g.*, Production 65, the government produced 1A materials that did not link to any particular MOI. In sum, the government's scattershot and incomplete production of MOIs and their associated 1A materials are a mess, and not readily reviewable *because* of the manner by which the government chose to produce them.

These 1A documents are material to the defense, pursuant to Fed. R. Crim. P. 16(a)(1)(E). Further, the 1A documents are often *Jencks* materials regarding the witness subject to the MOI or other witnesses in this case: they are often emails or reports authored by the government's trial witnesses. And Mr. Beebe further contends that the 1A files qualify as *Jencks* statements for the government's agents who attested to the inclusion and maintenance of the 1A materials in the 1A section of the witness file; if that government's agents did *not*, as they claim, maintain those

---

follow that Order. As one example, on November 17, two weeks after the Court's deadline, the government presented an FBI report detailing an April **2009** written report to the FBI documenting serious allegations against (now admitted felons) Jeff Dunlap and Warren Treme, as well as defendant Ashton Ryan. But despite its *Brady/Giglio* obligations, the Government did not produce the complainant's documentation of the misconduct he presented to the FBI, which included two confessions *written by* Dunlap. Like its other *Brady/Giglio* disclosures, the government redacted the contact information for the witness (and his attorney), as well as the contact information for the three FBI agents involved with that 2009 investigation, which *only* serves to obstruct Mr. Beebe's ability to develop impeachment evidence about the government's cooperating witnesses. And considering the government's acts of affirmatively withholding the documents and redacting this contact information, the government's obstructive conduct must be considered willful.

Following Mr. Beebe's request for this information, the government now disputes the report's statement that "Complainant faxed these confessions and checks to the FBI and they are included in this report" and asserts that no such records exist. This type of lie, presented falsely as fact in an FBI report, makes Mr. Beebe's demand for the 1A materials produced as such all the more important.

documents in the 1A section of the witness file, then the agents made false statements in their reports, and the prosecution is constitutionally obligated to present to the defense its evidence of the agents' false statements.

Importantly, during the parties' months-long discussions over these materials, the government conceded that Mr. Beebe is entitled to the materials contained in the 1A section of each witness file. Nevertheless, when Mr. Beebe asked (repeatedly) the United States to simply produce the 1A files—which, as stated, the reporting agents attested were complete and maintained with the MOI, and thus easily produced to the defense in the form maintained by the government— the prosecution "declined" this ready and obvious solution. The government instead required Mr. Beebe to identify MOI-by-MOI any missing documents, at which point the government will search for them.

The government's response is insufficient for two reasons.

First, the government's approach does *not* address the truth or accuracy of the agents' attestations of collecting and maintaining the 1A materials with the witness file. *Only* the production of the 1A materials, in the manner maintained by the United States, will provide this evidence. The government's contention that it will supply the materials mentioned in the MOIs upon specific request ignores that this approach doesn't result in production of the actual 1A files. Mr. Beebe is entitled to those materials, *viz.*, the 1A materials allegedly segregated and separately maintained with the witness files. As we now know from the government's recent *Giglio* disclosure that the agent reporting on the April 2009 complaint against Dunlap, Treme, and Ryan, lied in his report when he wrote that the "[c]omplainant faxed these confessions and checks to the FBI and they are included in this report." In sum, the government has no basis to withhold the 1A materials, Mr. Beebe has a right to them, and his need for these materials is acute.

3

Second, the government's approach only serves to waste time for Mr. Beebe's counsel, and there is precious little to spare. On this point, Mr. Beebe notes that the government's discovery production runs to more than 10 million documents, many hundreds of pages long, and countless hours of recordings. Even with respect to its trial exhibit list, the government has continued to flood Mr. Beebe with materials, which can rightly be seen as a stratagem to hide its case in a voluminous production.

More concretely, the government's initial disclosure of trial exhibits included 3,179 documents totaling 134,072 pages. The government's supplemental identification of trial exhibits added 47 documents, totaling 7,247 pages. Mr. Beebe is unaware of any trial in which the government sought to admit more than a couple hundred exhibits, much less more than 3,000 exhibits, and he contends the government will make no such attempt, or come near any such attempt now. Rather, it appears that the government will select a few hundred of these documents, while forcing Mr. Beebe to review all of them.

The government's audio exhibits tell a similar tale. The government's exhibit list contains 24 audio .mp3 files totaling 2.5 GB and 21 audio .wav files totaling 30.9 GB.[2] Using our vendor's applicable metrics approximating 1 MB of memory for 1 minute of runtime for .mp3 files, and 10 MB of memory for 1 minute of runtime for .wav files, the government's audio exhibits run to approximately 5,580 minutes, *viz.*, 93 hours. Plainly, the government is unlikely to expend 13 trial days playing audio exhibits for the jury. Nonetheless, it will succeed in forcing Mr. Beebe to

---

[2] Contrary to standard practice, the government provided no transcripts for any of its audio exhibits.

address this larded up volume of exhibits rather than provide him (and the Court) a clear presentation of the government's actual trial exhibits and actual trial presentation.[3]

Given this complex set of facts, the only reasons Mr. Beebe can conjure to support the government's refusal to produce the 1A materials in the form maintained by the government are (1) because it's shielding *Giglio* evidence regarding the agents' attestations that they maintained these materials in the 1A section of the witness files, and/or (2) the government seeks tactical advantage by forcing Mr. Beebe to dedicate his scarce resources to running down the missing 1A files MOI-by-MOI, and then having to re-review the MOI with the supporting documents another time. Neither is proper, and thus neither supports the government's position.

In sum, the 1A materials are discoverable, and the government has conceded that point. The government's agents have attested that these materials have been segregated and maintained in separate files, leading to the least arduous manner of producing these materials to the defense. The Court should thus grant this motion, and issue an Order directing the government to produce to Mr. Beebe the 1A section for each witness interview produced to date, and to identify clearly these 1A materials for each witness interview.

For these reasons and each of them, the Court should enter an Order compelling the requested disclosures.

---

[3] The government fails to heed its responsibilities despite being alerted to case law condemning its practices, as previously presented in this case. *See e.g.*, Doc. 635-1 at 3 ("The government may not properly identify a large number of documents that it may or may not seek to introduce at trial. *See, e.g., United States v. Crowder*, 325 F. Supp. 3d 131, 135 (D.D.C. 2018); *United States v. Morad*, No. 13-CR-101, 2013 WL 12208145, at *2 (E.D. La. Dec. 10, 2013); *United States v. O'Keefe*, No. 06-CR-0249, 2007 WL 1239207, at *2 (D.D.C. Apr. 27, 2007)").

### 2. The government should be ordered to produce the materials presented to S/A Bradford during her grand jury appearances.

On October 21, 2022, the government produced, *inter alia*, transcripts of S/A Bradford's October 4 and 11, 2018 and January 31, 2019 grand jury testimony. This request focuses on the insufficiency of the government's production of the October 4, 2018 transcript, the exhibits shown to the witness during her testimony, and the exhibits incorporated into the transcript by government counsel.

#### A. The October 4, 2018 Exhibits.

With respect to S/A Bradford's October 4 testimony, the government showed her and she testified about (1) a chart setting forth the 20 top First NBC Bank loan relationships under investigation, *see* 2018.10.04 Bradford GJ Trans. at 7[4]; and (2) additional slides addressing the subjects of this investigation, including Jeff Dunlap and Greg St. Angelo, targets who have since become cooperators. *See id.* at 9. The prosecutors then presented additional exhibits to S/A Bradford during her testimony, specifically incorporating those exhibits into the transcript of her testimony. *See id.* at 10-13 (grand jury transcript from matter 08-17-30, dated January 5, 2018; grand jury transcript for matter 02-18-02); (April 6, 2018 testimony of S/A Joseph Melle); (April 20, 2018 grand transcript of S/A Melle in GJ No. 02-18-02); (April 6, 2018 grand transcript of agent Christopher Orlando in GJ No. 02-18-02); (April 13, 2018 grand transcript of S/A Melle in GJ No. 02-18-02). Finally, the government presented to S/A Bradford a list of grand jury subpoenas issued by and/or returned to the grand jury. *See id.* at 35.

Despite Mr. Beebe's request for these materials, which he contends are (1) material to the defense pursuant to Fed. R. Crim. P. 16(a)(1)(E), and (2) are part and parcel of Bradford's grand

---

[4] Consistent with the protective order in this case, S/A Bradford's October 4, 2018 testimony is attached as Exhibit A filed under seal.

jury testimony,[6] which the government disclosed pursuant to its *Jencks* obligations, the government has refused to produce any of these materials to the defense.

As for the first category of documents—the chart of loan relationships shown to the witness and about which she testified—the government provided no reason for its declination. It instead pointed Mr. Beebe to *other* materials in its production, and informed Mr. Beebe it would not produce the actual chart it presented to S/A Bradford as part of her grand jury appearance. The government's offer of a bait-and-switch falls short of its discovery responsibilities.[7] This writing—the chart—was shown to the witness and was the subject of her testimony. Thus, in addition to Fed. R. Crim. P. 16(a)(1)(E), it should also be produced pursuant to 18 U.S.C. § 3500. *Cf.* Fed. R. Evid. 612. In sum, the exhibit shown to S/A Bradford during her testimony, and being the subject of her testimony, makes the exhibit part of the grand jury transcript. Accordingly, the Court should order the government to produce it.

The same is true for the other identified categories. The government declined to produce the exhibit slides shown to the witness because S/A Bradford didn't create them and declined to produce the grand jury transcript exhibits it "incorporated" into S/A Bradford's testimony because those exhibits are not S/A Bradford's testimony. As for the exhibit detailing the issuance and return of grand jury subpoenas, the government provided no excuse other than it "decline[d] to provide" the exhibit to Mr. Beebe.

---

[6] Just as an attorney cannot assess a deposition transcript in the absence of the exhibits shown to and commented upon by the witness, so too for grand jury transcripts, *viz.*, the exhibits presented to the witness must be examined to understand the testimony.

[7] Considering the government's response to the next category of documents (the slides shown to S/A Bradford)—that S/A Bradford didn't create the slides—suggests strongly that she created the chart that is the focus of this first request. Had S/A Bradford *not* created the chart, one would have expected the government to rely on that contention just as it did for the second category of grand jury exhibits requested. *See infra.*

But those excuses (and non-response) are irrelevant to Mr. Beebe's right to these materials, both under Rule 16(a)(1)(E) and *Jencks*. It doesn't matter who created the exhibits presented during S/A Bradford's grand jury testimony. What matters is that the government, in fact, presented these exhibits to the witness (and the grand jury) during her testimony. Because these exhibits are the subject of the witness's testimony, the Court should order the government to produce them immediately. *See also United States v. Howell*, 231 F.3d 615, 625 (9th Cir. 2000) (evidence relating to the thoroughness of the government's investigation is material to trial of the cause).

### B. The October 4, 2018 identification (but non-disclosure) of further *Brady/Giglio* concerning Greg St. Angelo.

During S/A Bradford's October 4 testimony, she disclosed the existence of a prior investigation into Greg St. Angelo concerning improper loans related to the failure of the bank. *See* 10/4/2018 GJ Trans. at 32-33. It is unclear whether St. Angelo's guilty pleas addressed that conduct, or if he was given a pass for that conduct based on his subsequent cooperation, or anything else about that investigation and its results because the government refused to provide the documents collected and created with respect to that investigation.

Instead of producing this critical discovery—which is constitutionally required under *Brady/Giglio* and their progeny—the government opted to inform Mr. Beebe that records exist regarding insider-trading violations by St. Angelo, which the government (now) asserts *ipse dixit* it could not sustain. Whether that's true or not, or whether the government tanked an insider-trading charge in exchange for St. Angelo's cooperation, is unknown. So too, evidence relating to the thoroughness of the government's investigation is material to the trial of the cause. *See Howell*, 231 F.3d at 625.

It is for these reasons that Mr. Beebe is entitled to the materials in the prosecution's possession and/or control reflecting that impeachment evidence of St. Angelo, and to assess for himself—as guided by the government's complete production of impeachment materials—the evidentiary value of this evidence. He cannot do so now, however, because the government refuses to produce the impeachment materials.

The government's withholding is improper, and the Court should correct it by issuing an Order directing it to produce *all* impeachment materials of *all* its witnesses, including specifically the evidence it gathered and assessed with respect to its prior investigation of St. Angelo. Absent such a strong Order, it is plain the government will withhold impeachment materials from Mr. Beebe, as it has done in this exact circumstance. Put another way, who knows what else the government is hiding? It's refusal to provide known impeachment evidence to Mr. Beebe only proves it has actively declined to meet its *Giglio* obligations.

### C. Documents addressing St. Angelo's compliance with his grand jury subpoena obligations.

The October 4 transcript further disclosed that St. Angelo remained out of compliance with the grand jury subpoena(s) issued to him during the investigative period. Considering St. Angelo's subsequent cooperation agreement with the government, Mr. Beebe asked the government to provide "the documents establishing when (if ever) St. Angelo came into compliance with the grand jury subpoena(s)" requests.

Rather than provide these materials—and one would expect that if St. Angelo *had* come into compliance with the grand jury's subpoenas, the government would promptly say so—the government directed Mr. Beebe to figure out the compliance question for himself, pointed to portions of its production, and admitted it continues to withhold documents produced by St. Angelo.

Respectfully, the government's response announces another bold declaration that it will not meet its *Giglio* obligations in this case. St. Angelo is its witness, and if he did not come into complete compliance with the grand jury subpoena(s) served upon him, that fact constitutes impeachment evidence, including as a benefit conferred upon him based on his cooperation. The government thus has a constitutional obligation to inform Mr. Beebe *if* St. Angelo came into compliance or not, and to provide that evidence in a usable format. Most plainly, the *Giglio* disclosure also suffers from a lack of any usable information whatsoever as it applies to the prior criminal history of potential witnesses. Such summaries are an "opportunity for mischief and mistake." *See United States v. Stevens,* No. 1:08-cr-231, Doc. 373 (4/7/2009 Hr'g Tr.) at 9 (Sullivan, J.). If *Brady* is to be meaningful, the information provided must in a format that is readily usable by the defense.

Here, not only has the government declined to produce this *Giglio* information, it told Mr. Beebe to figure it out himself at a time where the government admits it has not produced the relevant material. But even had the government provided those underlying materials, it still would not have met its *Giglio* obligation to provide the government's evidence—not Mr. Beebe's assessment—of whether St. Angelo ever came into compliance with the subpoenas, or simply got a pass by making a deal with the United States. The Court should order the government to provide this information forthwith.

3. **The Court should order the government to provide additional information and materials pursuant to its *Jencks* and *Giglio* obligations.**

On March 22, 2022, Mr. Beebe asked the government to affirm its practices for searching for and producing *Giglio* materials in this matter in light of the belated production of an MOI of Gary Gibbs that served as the basis for the disqualification of Mr. Calloway's counsel. This issue arose because on March 15, the government professed to learn for the first time of an agency report

10

concerning cooperating witness Gary Gibbs that it admitted "relates directly to this case." But the government did *not* learn of this important material from its review of the materials; rather, it claimed that it learned about this agency report from its cooperating witness, Gibbs. Plainly, the government's failure to uncover this agency report about Gibbs on its own raised genuine questions about the government's commitment to meeting in full its Rule 16, *Brady, Giglio*, and *Jencks* obligations, and Mr. Beebe correctly inquired on those subjects.

The government refused to address this issue at all, and simply declined to respond. Accordingly, Mr. Beebe reiterated this same request on September 28, 2022. On October 4, the government rejected that request, and assured Mr. Beebe it well understood its *Giglio* and *Jencks* obligations and would meet them. But the presentation set forth above proves the government is incorrect on that score. And there's more.

On November 3, the government purported to come into compliance with the Court's *Jencks/Giglio* deadline by producing with respect to Mr. Beebe **three** documents/disclosures:[8] (1) a letter from Austin Anderson, Jr. presenting claims against Greg St. Angelo long before the return of any indictment in this case, (2) disclosure that "[t]he United States Attorney has requested that the FDIC-C refrain from initiating or filing any enforcement action and from conducting any meetings with any respondents or potential respondents in any enforcement action until the end of the criminal trial[;]" and (3) disclosure that 12 of its trial witnesses have suffered criminal convictions or arrests.

---

[8] The remaining portions of the government's letter disclosed materials Mr. Beebe obtained himself (as the government previously told him to do while refusing to produce those publicly available documents in advance of the *Giglio/Jencks* deadline) or concern Arvind Vira, who is irrelevant to the allegations against Mr. Beebe.

While announcing *Giglio/Jencks* compliance, however, the government fell far short of meeting those obligations. With respect to the Anderson letter, the government redacted all of Mr. Anderson's contact information in this disclosure, obstructing Mr. Beebe's ability to locate and interview this witness. With respect to the United States's request that the FDIC-C "refrain from initiating or filing any enforcement action and from conducting any meetings with any respondents or potential respondents in any enforcement action," the government's disclosure failed to identify a single "respondent" or "potential respondent," and thus is of no value for use at trial and falls far short of *Giglio*'s mandate. And with respect to the disclosures of its witnesses' criminal conduct, the government's *Giglio* disclosure lacked any usable information as it applies to the prior criminal history of its witnesses. The summary it offered instead is an "opportunity for mischief and mistake." *See Stevens, supra*. Here, the information the government provided did not identify a jurisdiction or any detail sufficient to permit further investigation.[9]

But, of course, the defense shouldn't have to repeatedly identify the government's intentional withholding of *Brady/Giglio* materials, and by requiring it here, the government has demonstrated its material noncompliance with its constitutional obligations to Mr. Beebe. In sum, the government's *Giglio/Jencks* disclosures *prove* the United States intends non-compliance, and will require Mr. Beebe to hound it to get the compliance the government pretends it has accomplished. These facts certainly demonstrate the great need for a firm Order from this Court directing the United States to meet the obligations it declines to satisfy through incomplete productions and disclosures.

---

[9] The government later conceded Mr. Beebe's objections in part, provided an unredacted version of the Anderson letter, and provided additional information about its witnesses' criminal history. Notably, however, the government continues to withhold the documents in its possession, custody, and/or control regarding its witnesses' criminal histories.

While, as noted, the government relented on the Anderson letter and told Mr. Beebe's counsel to go fishing in discovery for the unredacted version of his letter, this circumstance itself speaks to this serious problem. The government's *Giglio/Jencks* disclosures were ordered to be complete when made; the government's demonstrated refusal to meet those obligations suggests strongly that other materials have been withheld, but unless Mr. Beebe can identify the government's failures, the government plainly won't make them.[10]

As for the criminal records of its witnesses in the government's possession, custody, and control, the government continues to withhold these materials and refused to provide them to Mr. Beebe. The government maintains this intentional withholding even though the government must disclose such materials to a defendant "within the government's possession, custody, or control." *United States v. JB Tax Pro. Servs., Inc*., No. CRIM.A. 13-127, 2014 WL 2533773, at *2 (E.D. La. June 5, 2014) (Wilkinson, M.J.) (citing Fed. R. Crim. P. 16(a)(1)(E)). Materials are clearly "within the government's possession, custody, or control" when the prosecutor has actually reviewed them or they are within his own file. *Id.* Materials "within the government's possession, custody, or control" extend beyond what the prosecutor has, or has seen, but not infinitely. *Id.* For purposes of Rule 16, government possession, custody, or control extends to materials in the possession of another federal—or even state—agency when the prosecutor is engaged in a joint investigation with that other agency or when the other agency is so closely aligned with the prosecution as to be considered part of the prosecution team or has contributed significantly to the investigation or prosecution. *Id.* (citations omitted).

---

[10] Mr. Beebe forecasts here that should the government obtain trial convictions for any defendant, the Court will see a post-trial *Brady/Giglio* production made "in abundance of caution" thereafter. But the time for these productions is now.

13

In this case, this includes records relating to these arrests and convictions and further details of which the prosecution team is aware. Nonetheless, the government declares *Giglio* compliance while withholding these materials. The Court should disabuse the prosecution of its intentional violation of *Brady/Giglio* and order the government to produce these documents forthwith.

Relatedly, the government's *Giglio* disclosure asserted that it "requested that the FDIC-C refrain from initiating or filing any enforcement action and from conducting any meetings with any respondents or potential respondents in any enforcement action until the end of the criminal trial." This disclosure did not identify any individual under the FDIC-C's investigation, who may have benefited from this request, and to what extent he or she might have. Counsel for Mr. Beebe brought this deficiency to the government's attention on November 10, 2022. On November 15, 2022, the government produced a November 10, 2022 letter from U.S. Attorney Duane Evans to the FDIC-C, asserting that it memorialized an October 17, 2022 phone conversation, although the letter makes no such representation, and an email from AUSA Payne to the FDIC-C on November 14, 2022 rolling back the request as to Brad Calloway. Setting aside the curious timeline presented by this belated disclosure, it remains incomplete nonetheless, as it still does not identify all of the individuals for whom the government has sought (at least a temporary) reprieve.

4. **The Court should order the government to produce all drafts of all plea agreements tendered to its cooperating witnesses.**

As established in the litigation related to the government's demand for a *Frye* hearing for Mr. Beebe, the government drafted—without consultation with Mr. Beebe—a plea agreement that recited Mr. Beebe's agreement to a complex of facts reciting his culpability. Mr. Beebe rejected that letter because the government's hand-crafted narrative was false.

But this circumstance demonstrates that the plea agreements ultimately entered by the government's cooperators do not necessarily reflect the government's assessment of each

14

cooperator's culpability, or the give-and-take (if any) that resulted in each cooperator's guilty plea. Mr. Beebe requested all drafts of plea agreements exchanged between the government and its cooperating witnesses so as to understand the divergence (if any) between the government's contentions and each cooperator's admissions, but the government refused production.

Plainly, the government's decision to relent on any particular admission, or the government's inclusion of admissions that were rejected by the cooperator, is relevant to each cooperator's testimony, and may ultimately present impeachment material regarding the government's concessions to each cooperator to secure his testimony.[11] This is different from Mr. Beebe's earlier request, which the Court addressed in its Order and Reasons at Doc. 736. The Court's Order and Reasons contemplated only the *benefit conferred* aspect of *Giglio* and not the credibility of the cooperating defendant or impeachment material that can only be ascertained through drafts of the plea agreements and factual bases. *See* Doc. 736 at 8.

The Court should thus enter an Order directing the government to produce to Mr. Beebe *all* drafts of *all* plea agreements exchanged between the government and its cooperators, including all correspondence addressing the changes to the initial plea agreement crafted by the United States.

**5. Complete Loan Files.**

Mr. Beebe has previously presented his request for complete loan files to the Court. In response, the Court stated:

> Under Rule 16(a)(1)(E), Beebe is certainly entitled to the full loan files. However, the government maintains that it has already produced to defendants the complete loan files in the manner in which they were provided to the government by the FDIC-R, which seized control of the Bank's documents following its closure. R.

---

[11] Every cooperator is a male, thus making applicable only the male pronoun.

15

> Doc. 311 at 3. Beebe has offered no evidence that would reasonably cast doubt on the government's representation.

Doc. 736 at 5.

This problem persists, for two reasons, now supported by evidence illustrating why the government should be compelled to identify, at a minimum, identify the complete loan file by bates number. First, when the government identified the loans in play at trial, it acknowledged that "[t]he same loan document may be located in several locations in the discovery, however, and we will endeavor to use the best copy as a trial exhibit." Counsel for Mr. Beebe asked the government to identify by bates number the other versions of these trial exhibits so that he could assess for himself which copy is "the best." The government declined this request. Since that time, Mr. Beebe's need to locate and review these documents is even more compelling because the government routinely chooses the version best suited to its presentation, rather than a full and accurate representation of the facts. For example, in its opposition to Mr. Beebe's expert witness, the government inserted the following screenshot of Mr. Beebe's loan and overdraft authority, even though three other documents in the bank's records showed that it was less:

*Compare*

Date Printed: 7/30/2012 3:28 PM

**FIRST NBC BANK**

**LENDING AND OVERDRAFT AUTHORITIES**

**June 26, 2012**

| | |
|---|---|
| **Full Board** | All transactions with aggregate exposure over $20,000,000. |
| **Board Loan Committee** | All transactions with aggregate exposure that exceeds Senior Loan Committee loan authority up to $20,000,000. |
| **Senior Loan Committee** | All transactions with aggregate exposure that exceeds CEO / President's loan authority of $5MM up to $12MM. |
| Ashton J. Ryan, Jr. | CEO, Ashton Ryan's loan authority will be $5,000,000. Loans over $5MM will require approval from the appropriate approval authority. On credits for which the President is unable to be involved in the credit decision, approval will be required from the Senior Loan Committee and President Ryan must abstain from the vote. |

| OFFICER | TITLE | SECURED | UNSECURED | OVERDRAFT |
|---|---|---|---|---|
| Beebe, Fred | Comm Relationship Manager | $500,000 | $100,000 | $50,000 |
| Burnell, William | Chief Credit Officer | $1,500,000 (1) | $250,000 (1) | $100,000 |
| Calloway, Bend | Comm Relationship Manager | $500,000 | $50,000 | $50,000 |

GX 110.050, USAO-0008911354, p. 182.

*with*

FNBC-N-0006-00080518-190

Date Printed: [DATE \@ "M/d/yyyy h:mm am/pm" ]

**FIRST NBC BANK**

**LENDING AND OVERDRAFT AUTHORITIES**

**April 2, 2015**

| | |
|---|---|
| **Full Board** | All transactions with aggregate exposure over $25,000,000. |
| **Board Loan Committee** | All transactions with aggregate exposure that exceeds Senior Loan Committee loan authority up to $25,000,000. |
| **Senior Loan Committee** | All transactions with aggregate exposure that exceeds CEO / President's loan authority of $7.5MM up to $15MM. |
| Ashton J. Ryan, Jr. | CEO, Ashton Ryan's loan authority will be $7,500,000. Loans over $7.5MM will require approval from the appropriate approval authority. On credits for which the President is unable to be involved in the credit decision, approval will be required from the Senior Loan Committee and President Ryan must abstain from the vote. The CEO's overdraft authority is set at $7,500,000. |

| OFFICER | TITLE | SECURED | UNSECURED | OVERDRAFT |
|---|---|---|---|---|
| ▮▮▮ | Director of Retail | $150,000 | $25,000 | $10,000 |
| ▮▮▮ | Branch Manager | $25,000 | $2,500 | $1,000 |
| ▮▮▮ | Branch Manager | $25,000 | $2,500 | $1,000 |
| ▮▮▮ | Assistant Manager | $0 | $0 | $1,000 |
| ▮▮▮ | Senior Loan Officer | $1,500,000 | $250,000 | $25,000 |
| ▮▮▮ | Branch Manager | $15,000 | $2,500 | $1,000 |
| Beebe, Fred | Comm Relationship Manager | $500,000 | $100,000 | $15,000 |

17

*and*

FNBC-N-0006-00080517-202

Date Printed: [ DATE \@ "M/d/yyyy h:mm am/pm" ]

# FIRST NBC BANK
## LENDING AND OVERDRAFT AUTHORITIES
### January 19, 2016

| | |
|---|---|
| **Full Board** | All transactions with aggregate exposure over $25,000,000. |
| **Board Loan Committee** | All transactions with aggregate exposure that exceeds Senior Loan Committee loan authority up to $25,000,000. |
| **Senior Loan Committee** | All transactions with aggregate exposure that exceeds CEO / President's loan authority of $7.5MM up to $15MM. |
| **Ashton J. Ryan, Jr.** | CEO, Ashton Ryan's loan authority will be $7,500,000. Loans over $7.5MM will require approval from the appropriate approval authority. On credits for which the President is unable to be involved in the credit decision, approval will be required from the Senior Loan Committee and President Ryan must abstain from the vote. The CEO's overdraft authority is set at $7,500,000. |

| OFFICER | TITLE | SECURED | UNSECURED | OVERDRAFT |
|---|---|---|---|---|
| | Director of Retail | $150,000 | $25,000 | $10,000 |
| | Branch Manager | $25,000 | $2,500 | $1,000 |
| | Branch Manager | $25,000 | $2,500 | $1,000 |
| | Assistant Manager | $0 | $0 | $1,000 |
| | Senior Loan Officer | $1,500,000 | $250,000 | $25,000 |
| | Branch Manager | $15,000 | $2,500 | $1,000 |
| Beebe, Fred | Comm Relationship Manager | $500,000 | $100,000 | $15,000 |

*and*

FNBC-N-0006-00080515-199

Date Printed: [ DATE \@ "M/d/yyyy h:mm am/pm" ]

# FIRST NBC BANK
## LENDING AND OVERDRAFT AUTHORITIES
### December 27, 2016

| | |
|---|---|
| **Full Board** | All transactions with aggregate exposure over $25,000,000. |
| **Board Loan Committee** | All transactions with aggregate exposure that exceeds Senior Loan Committee loan authority up to $25,000,000. |
| **Senior Loan Committee** | All transactions with aggregate exposure that exceeds CEO / President's loan authority of $7.5MM up to $15MM. |
| **Ashton J. Ryan, Jr.** | CEO, Ashton Ryan's loan authority will be $7,500,000. Loans over $7.5MM will require approval from the appropriate approval authority. On credits for which the President is unable to be involved in the credit decision, approval will be required from the Senior Loan Committee and President Ryan must abstain from the vote. The CEO's overdraft authority is set at $7,500,000. |

| OFFICER | TITLE | SECURED | UNSECURED | OVERDRAFT |
|---|---|---|---|---|
| | Director of Retail | $150,000 | $25,000 | $10,000 |
| | Branch Manager | $25,000 | $2,500 | $1,000 |
| | Branch Manager | $25,000 | $2,500 | $1,000 |
| | Dr. of Institutional Banking | $0 | $0 | $5,000 |
| | Assistant Manager | $0 | $0 | $1,000 |
| | Senior Loan Officer | $1,500,000 | $250,000 | $25,000 |
| Beebe, Fred | Comm Relationship Manager | $500,000 | $100,000 | $15,000 |

Critically important to the elements of bank fraud and the charges against Mr. Beebe, the defense has identified several versions of loan documents that disprove the government's claims because the loan was signed or approved by a higher-up, such as Mr. Burnell, *before* Mr. Beebe ever signed the memorandum, demonstrating the immateriality of his signature and refuting the statements that the government attributed to Mr. Burnell in his factual basis, like the following:

**First NBC Bank**
**CREDIT MEMORANDUM**

18109

| | | | |
|---|---|---|---|
| Report to SLC: | No. | DATE OF APPLICATION: | 01/06/16 |
| DATE OF CREDIT MEMO: | 02/04/16 | CIF NO.: | AAB5196 |
| NAME: | Warren Treme | LOAN NUMBER (renewals only): | New 1000151552 |
| ADDRESS: | 3916 Wheat Dr., Metairie, La 70002 | TYPE OF BUSINESS: | Financial Holding Company |
| TAX ID or SSN: | [redacted] | PRINCIPALS/OWNERSHIP: | Warren Treme |
| PHONE: BUSINESS: | | NAICS CODE | 551112 |
| HOME: | | PURPOSE CODE: | 51 - Commercial General Purpose |
| CELL: | | RISK RATING: | 6-Acceptable with care |
| EMAIL/FAX: | | PARTICIPATION: | N/A |
| LOAN AMOUNT: | $250,000.00 | LOAN TYPE: | NRLOC (Please note if SBA 504 or SBA 7A) |
| REPAYMENT: | Single Pay, Principle and Interest due at maturity | MATURITY DATE: | 30 days |
| RATE: | WSJP floating with a floor of 5% | | |
| FEES: | | NEW or RENEWAL: | New |
| LOAN: | | Amt of Increase or decrease, if any: | |
| DOCUMENTATION: | $100 | Does Transaction Result in a TDR: | No |

(If Renewal, Refinance, Restructure or Consolidation of Debt, Complete TDR Information on Page 2)

| | |
|---|---|
| LOAN PURPOSE: | Short term loan for 30 days to cover business expenses |
| GUARANTORS: | N/A |
| LIFE INSURANCE INFORMATION: | N/A |
| | Please provide the amount of life insurance that will be required on all associated individuals, both individual borrowers and guarantors. |
| COLLATERAL DESCRIPTION: | Unsecured |
| ADVANCE RATE (LTV/LTC): | N/A |
| PRIMARY SOURCE OF REPAYMENT: | Income from Borrower |
| SECONDARY SOURCE OF REPAYMENT: | Income from business operations |
| PROJECT INFORMATION: | The subject request will be paid off and secured once the appraisal for the property located on the Northshore known as Wadsworth is received. |
| | Project information should include: project's anticipated time frame, what the contingency plan, and what the Bank's exit strategy will be to repay the debt. |
| ON SITE VISIT: | Numerous times |
| PROPOSED COVENANTS: | None |
| FINANCIAL REPORTING: (selections provided) | Annual financial statements and tax returns on borrower(s) |
| OTHER FINANCIAL REPORTING: (Agings, brokerage stmts, etc.) | |

Please accompany the Credit Memo with a Loan & Deposit Recap!

| | | | |
|---|---|---|---|
| Direct Loan Exposure: | $2,300,387.00 | Branch: | Kenner |
| Indirect Loan Exposure: | $3,049,842.00 | Credit Officer: | |
| Total & Proposed Exp: | $5,350,229.00 | Account Officer: | Fred Beebe |
| Total YTD Deposits: | $1,913.88 | | |
| APPROVING OFFICER: | Fred Beebe | ADDITIONAL APPROVING OFFICER: | Bill Burnell |
| SIGNATURE: | | SIGNATURE: | |
| DATE: | | DATE: | 2/12/16 |

**APPROVAL VERIFICATION**
J Cockran

For all of these reasons, Mr. Beebe moves the Court to grant his motion to compel.

Respectfully submitted,

| | |
|---|---|
| */s/Sara A. Johnson* | */s/Ethan A. Balogh* |
| Sara A. Johnson (La. Bar No. 31207) | Ethan A. Balogh (*pro hac vice*) |
| 700 Camp Street | 100 Pine Street, Suite 1250 |
| New Orleans, LA 70130 | San Francisco, CA 94111 |
| (504) 528-9500 | (415) 391-0440 |
| sara@sarajohnsonlaw.com | eab@balcolaw.com |

## CERTIFICATE OF SERVICE

This certifies that I electronically filed the foregoing Motion with the Clerk of Court by using the CM/ECF system that will send a notice of electronic filing to all counsel of record.

Dated:  November 29, 2022.        */s/Sara A. Johnson*
                                  Sara A. Johnson